Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the court is now sitting. God save the United States and this Honorable. Good morning. I please the court. My name is Stephen Klein on behalf of Dennis Fusaro. As the clock reflects, I've reserved five minutes for rebuttal. Dennis Fusaro is a political consultant with broad experience that ranges from election campaigns to grassroots advocacy. His speech in this case stems from the latter. His desire to speak out about the Maryland state prosecutor, a past campaign finance prosecution against him by the state prosecutor, and even this pending case. He would do so via direct mail with names and addresses drawn from the Maryland registered voter list, which is furnished by the state board of elections. But Mr. Fusaro cannot do so without risk of another prosecution by the state prosecutor. That is the risk of criminal charges and imprisonment under Maryland Code Election Law Article Section 3-506 for using the list for a purpose, quote, not related to the electoral process, unquote. These electoral process restrictions are unconstitutional under the First Amendment for at least two reasons. They fail Anderson verdict balancing and they are unconstitutionally vague. Beginning with Anderson verdict balancing as to this content restriction, the only remaining state interests are protecting privacy and more relatedly, encouraging voter registration. The burdens on Fusaro are substantial, a deprivation of a valuable political tool for engaging Maryland voters through a tried and true medium, direct mail, which Mr. Fusaro in his deposition discussed his experience and the effectiveness of, and it's available in the joint appendix beginning at page 312. This serves as a powerful deterrent to the open discourse of ideas that is the hallmark of a free people. The state interests are really just kind of speech restrictions dressed up. They're over inclusive because they sweep far too broadly. There's noting despite what some mentions in the opponent's briefing, that name, address and voting history are the only things provided on this list. Date of birth, phone number, email, these are not provided. There's no interest in preventing robo calls here. The list itself is now available under the National Voter Registration Act. That's why the electoral process restrictions are now part and parcel and just front and center in this case. How can it be private if it's anyone can get it now? Maryland registered voters, Maryland voters, Marylanders who are not registered to vote, nonprofits such as Judicial Watch, and even Mr. Fusaro himself, who has in fact acquired a copy of the list. The state interests are also under inclusive. They provide distinctions really without a difference when it comes to the content that is being censored. Never really discussed is how our election mailers, it permits election mailers, we see this in one of their footnotes in their brief acknowledging that one could in fact send a letter that is about relating to a political campaign or expressly advocating for the election or defeat of a candidate perhaps, while discussing a big, big issue, or maybe even, you know, the electoral mudslinging we see every election cycle. Mr. Kahn, is your challenge facial or as applied? Both, Your Honor. But as applied, I think it certainly shows. If it's as applied, isn't it moot now? Your Honor, the access provision is moot in section 3-506. It is not moot as to Mr. Fusaro's mailers, particularly there's, I think the argument there from opposing counsel is that his vagueness argument has been waived in some fashion. But as far as these content restrictions, there seems to be at least some acknowledgement, though the opposing counsel and opposing parties did everything they could to not say, not give an opinion as to whether Mr. Fusaro's mailers are related to the electoral process or not. Again, accepting that they are not, the idea is what difference, what privacy is being protected when mudslinging emails or mudslinging mailers can be sent out by candidates, but Mr. Fusaro cannot send his letters. That's where this balancing again should tip in favor of Mr. Fusaro being able to engage in broad political advocacy. Where it gets very strange in it, and I think that I will emphasize here for the first time and will continue to do so. Mr. Klein, Mr. Klein, are you suggesting or arguing that the state cannot restrict this, these letters to a political or electoral process? Let's assume that could be defined or is defined appropriately. Are you saying that the state could not limit the use of letters or restrict the letters sent out to electoral process? Yes, Your Honor. I don't believe it's appropriate here because of the speech interest for Mr. Fusaro. And moreover, pages 48 and 49 of the FOE's brief. The answer to the question is yes, you would say they're limited. To do from that, to that, limited? They can't do that? Yes, Your Honor. I would argue they cannot, Mr. Fusaro cannot send his letters. No, no, I didn't say he couldn't send the letters. It says that the restriction is, you know, you can't be involved, you can't do it and be involved in anything limited to electoral process. You're saying they can't do that. See, your vagueness part, I'm assuming it's not vague. It's not overbroad. I'm just saying, are you saying that's not an appropriate restriction? It is not an appropriate restriction, Your Honor. How do you then square that with Lehman? I know Lehman was a little different. It was all bus. It was a transit thing, but why couldn't they restrict everybody from doing that? It was well defined and no one could use it for anything other than the electoral process. Why couldn't they do that? I think the biggest problem, Your Honor, is that some people can, and that's where the pages 48 and 49 of the police brief basically provides a very big and interesting problem that incumbents may use the letter to send anything they want relating to, and I quote, unofficial legislative newsletters. To disseminate information to a constituent voter or potential voter about one or more issues of public interest chosen by the incumbent. So we discussed that actually, as far as, again, privacy, this restriction only applies to certain people, right? We're not actually protecting, using that term loosely, preventing strictly based, strictly things that go to the electoral process. And I understand and beg the court's indulgence as far as a lot of these issues kind of ping-ponging back and forth between one another. But as far as this burden of a powerful electoral tool being prohibited in this fashion should weigh, in fact, in favor of FISARO, not in fact in favor of the state. You're claiming it should restrict scrutiny? Judge King, yes, yes, I am. And that's where things get very interesting as far as the mootness of the access provision in this case. Exercising constitutional avoidance, the court below decided that the access provision, because anyone can get the list now under the NVRA, that they just, it's moot. And we're just going to analyze the electoral process restrictions. But that's not, it's not so much constitutional avoidance as a constitutional collision with Sorrell versus IMS health. This, you know, understanding, again, the procedure of this case is a little messy. But if all that's left now is a content restriction on information that is required under federal law to be disclosed to people, it parallels Sorrell versus IMS health almost perfectly. But instead of dealing with speech about pharmaceuticals, we're dealing with speech, political speech, the core of democracy. The case echoes in so many ways that I would argue, at least in the third note, sticking with the law of this case, with this court's prior ruling, Anderson verdict and vagueness, either of these should are independent grounds to strike these provisions. But it is so, the law of the case may not control, perhaps instead the law of the law, the law as it stands now, because Judicial Watch versus Lamone was not appealed. Anybody can get this list now. So this content restriction under state law is really more akin to IMS health and is removed from really public records doctrine. You said a while ago, or at least I thought I heard you say, you could not send your letters. What did you mean by that? Your Honor, using the list for a purpose not related to the electoral process. And Mr. DeSarlo's letters, I think the state again saying, well, he's just self censoring. We're not going to say one way or the other, whether we prosecute him for sending these things. I would say he's either chilled by vagueness from sending them or he is directly censored because he's not really talking about the electoral process. I do want to emphasize as well, there's some discussions of standing and certain pigeonholing of this case to a place that vagueness doctrine can never be argued in the alternative. And I have serious concerns about that. And I certainly think that the court below had no desire to say one way or the other, whether where Mr. DeSarlo's letters would fall. And arguably, maybe they would, maybe they wouldn't. We won't really know until if he takes that risk, which is the problem under criminal law. Well, what would be the content of the letter if it's outside the electoral process? What do you talk about sending? Your Honor, his second letter is basically a critique of the joint appendix, at least the most recent letter that no longer criticizes the former state prosecutor. But his second letter is the joint appendix, page 350. And it is a, again, a letter encouraging the state voters to contact the state prosecutor's office and perhaps take different priorities when it comes to prosecuting political speech cases. Now, again, it's interesting. Why isn't that in the electoral process? What you just said is talking about the electoral process and responsibility of elected officials. Your Honor, getting an answer on that would be excellent. And I think that's the concern here is, again, it's such a amorphous standard. Again, pages 48, 49 of the police brief, suddenly they suggest a narrowing construction, right? They suggest at one point because there's, you know, we have not related to the electoral process. And then we have the defendant's brief pointing to at least like four different definitions of what we might do with this. Most of them just rearrange and add more words that don't really add any clarity. But they suggest a narrowing construction of expressly related to the electoral process. And then immediately follow that with a discussion of, yeah, but incumbents can go ahead and send issue, you know, mailers that have just discussed issues of public importance that matter to them because that's a permissible campaign expenditure under the election law. Now, that was nowhere discussed in the court below or the substantial joint appendix we built. But that's news to me. The 30B6 witness for the Maryland Board of Elections even said a legislative mailer like that would have to have a more express purpose to increase an incumbent's visibility or his electability. So we don't, you know, it's just it keeps moving. It's a moving and amorphous target. So, yes, it is vague and it provides, you know, for both reasons, it's not readily understandable by a person of ordinary intelligence. And it also is arbitrary, you know, poses the risk of arbitrary and discriminatory enforcement. Well, if there's some question about electoral process, the definition thereof, I mean, typically what we do is go to various treatises and dictionaries, and in particular, Black's Law Dictionary, which does define the term electoral process. So by reading that definition in Black's, won't you know what you can do or not do? Your Honor, I think relates to is the other big problem. OK, and that's where it's, you know, especially with a so-called narrowing construction, we say, you know, related generally. You don't understand what relate to means? Your Honor, it has been narrowed in many contexts, particularly in campaign finance law. That has been you can't just go, OK, you know, you can't just require campaign disclosure, for example, of things that are related to political advocacy. And then they provided a narrowing construction that goes back to Buckley versus Vallejo. Here we're talking about bans, a speech ban, criminal penalties for violations. And there needs to be some kind of understandable definition, one that does not involve, you know, connect the dots so that, hey, if it's a permissible campaign expenditure, it is part and parcel of the state's words of the electoral process, even though the content is not expressly related to the electoral process. So I raise, I think, again, the First Amendment standards here. Regardless, you know, under this posture of the case, there's myriad reasons for violations of the First Amendment here. And we ask that this court reverse the court below. Thank you so much, Mr. Klein. Thank you, Your Honor. Four years ago, nearly four years ago, Mr. Fisaro initiated this lawsuit intending to communicate with Maryland residents about what he believed was his unconstitutional prosecution by the then state prosecutor of Maryland. And to do so, he wanted to use a particular government record, the list of registered voters that Maryland makes available to applicants subject to a certain condition. And that condition is relevant in this case, is that the applicant must swear that they will not use the list for commercial purposes or any other purpose not related to the electoral process. But importantly, a person who does not agree to this condition is not then foreclosed from communicating with Marylanders. Far from it, a person may use campaign donor lists, which are publicly available and free on the Maryland Campaign Finance website. A person may obtain lists from the private sector, may utilize services available through the U.S. Postal Service, may conduct a targeted social media campaign to distribute letters in that way, may leaflet, may submit, may distribute flyers, may even use the popular press. Who pays for that list, Mr. Trento? When somebody asks for that list from the state, who pays for that? Well, there are two people who pay for it, Your Honor. One of the conditions on accessing the list is to pay a fee. I think the current fee is $128 to obtain the list. But obviously, maintaining a database with voters, like the list of voters constantly updating, costs more than just the $128 fee to make the list available to people. And so to some extent, it is subsidized by the state. The state doesn't charge what the real costs of maintaining that list are. So in another sense, it's also subsidized by the state. Well, that means the taxpayers are paying the cost. That's correct, Your Honor. Wouldn't the state have an interest in protecting the taxpayer? That is one of the interests that the state has in this case. Certainly, there was the registered voter restriction that Mr. Klein alluded to earlier. By making the list available at the outset initially to only Maryland registered voters, the state was attempting to provide a subsidy to those Maryland taxpayers who are indirectly funding the maintenance of the list in the first place. But as Mr. Klein alluded to, the Judicial Watch case ruled that the registered voter restriction and only the registered voter restriction was preempted by the National Voter Registration Act because it presented an obstacle to the accomplishment of Congress' objectives in passing that legislation. One of those objectives was to ensure that states maintain accurate voter rolls. And the court concluded that a limitation on who can access that list based on where they live or whether they're a registered voter was incompatible with that, was an obstacle to the accomplishment of that objective. This is not the case with the restriction at issue now before the court, which is the condition that a user agree or an applicant agree not to use the list for any purpose not related to the electoral process. In fact, Judicial Watch in obtaining that list had no issue with swearing that oath because the purpose for which they acquired the list was to ensure the accuracy of the voter list, and that is consistent with a use related to the electoral process. So that condition continues to apply here, and anyone, any non-Marylander or Marylander alike seeking to obtain the list must still abide by that condition. Mr. Chanto, you said electoral process. Do you agree that that's bigger than just running for the office? Well, certainly it's bigger than just running for the office because I think electoral process also encompasses the mechanics of an election. It encompasses maintaining the accuracy of the voter list. It encompasses how elections are administered in the state. And so certainly it also encompasses competitions and candidacies and one candidate versus another in advocating for a candidate's election or defeat, but it's not limited to that, Your Honor. Right. So it also includes information, doesn't it, about what a person or what the citizens, who they're going to vote for and what issue. Would you agree that's part of the electoral process, educating? I absolutely agree, Your Honor, if it's framed in the context of who they want to vote for. I think that there just needs to be a hook. There needs to be some sort of connection drawn between the intended use and the electoral process, whether that's a particular candidate or a competition, whether that's a general advocacy that in the next election, voters should consider those candidates and elect those candidates who believe this particular issue. I think there just needs to be a connection to an election or an electoral process. And the problem with... I'm sorry. I'm just looking at their interest. And certainly you would say this is not a viewpoint restriction, correct? Correct, Your Honor. It's not a viewpoint restriction. That means you can say negative things about people who are in public office in order to... information is to be positive or negative, correct? That's the nature of electoral communications, Your Honor, as Mr. Klein referred to the mudslinging that all of us are familiar with and we see during elections. It's mudslinging. It may be unappetizing, but it's also related to the electoral process. And if I could, Your Honor, you referenced the viewpoint neutrality. If I could address Mr. Klein's... the concern he raises about legislators having an ability that average citizens like Mr. Fusaro don't. And I believe that's a misreading of the law. What Section 13406 of the Election Law Article of the Maryland Code allows legislators to do is to use campaign funds to share their legislative accomplishments or issues of concern to the incumbent with voters. But by using campaign funds, they are by definition advancing the electoral prospects of the candidate and are required to slap an authority line on the transmission. In other words, that letter will have at the bottom of it paid for by friends of Chief Judge Gregory or paid for by friends of Dennis Fusaro under the authority of the treasurer of that campaign. There is an express connection to the electoral process in that transmission. And Mr. Fusaro is able to do the same thing. He can use the list to share with Maryland voters issues of concern to him as long as it's in some way connected to a candidacy, connected to the electoral process, the administration of the election, the mechanics of the election, when Election Day should be. There are any number of ways that one can connect issues to the electoral process, but there needs to be a connection. And the problem with Mr. Fusaro's intended use of his purposes for which he wants to communicate with Maryland voters and the letters that he has drafted to do so is that he admits that they are not. He goes out of his way to avoid any connection with an electoral process because, as the record reflects, for other reasons, he's afraid of being prosecuted for lacking an authority line on his transmission. And so Mr. Fusaro concedes that his letters are not related to the electoral process, and so he shouldn't be heard now to complain about not knowing where the boundaries are. So this is the situation Mr. Fusaro finds himself in. He is free to communicate his letters word for word using any of the other tools available to him, but he has chosen to, and it is a choice to litigate this case for years to try to be able to use a voter list in order to do so. This isn't a speech ban. It's not a restriction on what kind of speech he can make. It's just a restriction on his use of a particular government record in order to engage in that speech. The district court, when this very panel heard this first appeal, it recognized that there was a First Amendment dimension to what Mr. Fusaro intended to do, and it remanded the case with instructions to the district court to weigh the burden imposed by this access restriction on Mr. Fusaro's First Amendment rights against the state interest supporting this restriction. It also instructed the district court to evaluate Mr. Fusaro's vagueness claim. All that was thoroughly done, was it not, sir? Your Honor, I think the record is fulsome. The issues were litigated below Mr. Fusaro. That's what I'm getting at. I want you to tell us what y'all did when I went back. Sure. Mr. Fusaro supplemented his complaint, given that Mr. Davitt had resigned. He drafted a new letter that was intended, again, largely similar message, but intended to include information about this case and to direct Maryland voters to contact the state prosecutor and tell the state prosecutor not to bring prosecutions in violation of the First Amendment. Then we entered a period, the complaint was answered, we entered discovery. Mr. Fusaro was deposed, the State Board of Elections witness was disposed, interrogatories were served and responded to, and then we went to summary judgment. The district court evaluated the claims on the basis of what this panel had directed it to do, with the benefit of a full summary judgment record, and found Mr. Fusaro's claims to be without merit, and that should be affirmed. I'm sorry. Go ahead, Judge Keynes. The district judge then had a very thorough opinion on remand as well. Is that correct? Your Honor, I believe the district court's opinion was thorough and complete. It addressed all the issues, and fundamentally it was correct, and for that reason it should be affirmed. There's no need for this court to revisit the standard that it selected to be applied in this case in the first instance. Mr. Fusaro is trying to reframe this case now as Maryland attempting to regulate his use of information already in his possession, like in the Sorrell case, as opposed to imposing a condition of access that Mr. Fusaro has agreed to abide by. And that's simply not the case. In Sorrell, the information that was in the possession of the pharmaceutical companies was already in their possession. The laws attempted to regulate what they could do with it, but that was information that they gained in their normal course of business. The Supreme Court said in that case that the state, absent satisfying strict scrutiny, cannot limit what those entities could do with that information. It seems to me that, or at least there's a hint, that the appellate is trying to use the O'Brien test for symbolic speech. Is that your understanding? Well, I think he may be. I think what he's trying to do, Your Honor, is turn this case into Sorrell. What he's trying to do is whatever this panel decided to do in the first instance, given the fact that Mr. Fusaro didn't have the voter list yet, he now has the voter list. And so the court should evaluate this case as though this were Sorrell versus IMS. And for the reasons I stated, Judge Floyd, it's simply not Sorrell versus IMS. If anything, I would say that Mr. Fusaro, by agreeing to the condition that he not use the list for a purpose not related to the electoral process, he has mooted his claim that the condition violates the First Amendment because it's not so much the state law that's restricting him. It's his own agreement and oath that he would swear that he not do that. And so the court should not go back on the standard that applied in this case in the first instance because the facts are essentially the same. This was a condition of access that he's still complaining about, and that's how it should be evaluated. In the district court, the district court correctly did that evaluation and correctly concluded that the electoral process condition passes constitutional muster under Anderson's verdict. As the court is aware, the Anderson verdict test requires weighing the burden imposed by the restriction on the applicant or on the plaintiff against the interests of the state that are furthered by the restriction. As this court has already concluded, the burden on Mr. Fusaro imposed by the electoral process requirement is not severe, but the record now shows how modest it really is. In his deposition, Mr. Fusaro explained that his need for the list was based on wanting to reach civic-minded Maryland residents, but he could not meaningfully articulate why the voter list would be preferable to other resources to reach such individuals. He attempted to do so by suggesting that the state prosecutor would be more responsive to letters from voters, but that's expressly contradicted in the record by the state prosecutor, that's at 410 of the joint appendix, and who in any event is not appointed by elected officials at all, but rather a commission on which only two out of seven of the members are elected officials. It's not even clear how the state prosecutor would even know he was being contacted by voters who received Mr. Fusaro's letter and contacted him, because Mr. Fusaro does not instruct voters to say, oh, by the way, I'm a registered voter, Mr. State Prosecutor, you really should not prosecute people in violation of the First Amendment. Mr. Fusaro also acknowledged that other resources like campaign donor lists, which are publicly available on the Internet and free, could also be useful for his exercise. Specifically when asked why he couldn't do with a free publicly available contributor list what he wanted to do with the voter list in this case, Mr. Fusaro replied, I don't know, I haven't done the full analysis yet, I might want both lists. That's at 346 to 47 of the joint appendix. Mr. Fusaro also intends to spend only several hundred dollars sending his letter, which would allow it to reach only the smallest fraction of the 4 million registered voters in Maryland. But presented with this, Mr. Fusaro had no idea how he would identify those recipients from the 4 million strong list of registered voters in Maryland. His response to the specific question was, wow, I hadn't gotten that far. That's the joint appendix 335. Now my recitation of the record here is not to denigrate Mr. Fusaro's views or suggest that they are not entitled to First Amendment protection, nor is it somehow to criticize his access to resources or belittle what he intends to do. But it's simply to underscore that not being able to use the voter list to send his intended communication does not impose a burden on him in any meaningful way. There are other resources that don't have this restriction that are available to him and that he can utilize for the same purpose. No law in Maryland prevents Mr. Fusaro from sending the same letters, word for word, to Maryland residents using any other available resource. The unavailability of the voter list for this purpose does not meaningfully burden his ability to communicate with Marylanders, even civic-minded Marylanders, about anything. Now in contrast to these burdens, these modest burdens, Maryland's interests are important and supported by reasoned, credible argument. Promoting voter registration is well accepted and even laudable, as Mr. Fusaro says at page 8 of his reply brief. What it is not is censorship by another name. The record shows that the Board of Elections receives 15 to 30 complaints a year from voters about the availability of their public voter registration information. The legislature in Maryland has accounted for these concerns expressed by voters by imposing conditions on access that required applicants to swear they will use the list only for certain purposes. Restricting permissible uses has a credible relationship with fewer efforts to contact people whose information appears on the list and fewer voter complaints about such contact. You talk about the, he, Mr. Fusaro has other access or means of getting this, but you lost on that issue really the first time. Your argument was, well, no, this is really not speech at all. This is just really documents. And you lost on that because we found that, no, no, this is closely tied to speech. So you didn't win on that, but you're relying today heavily on that argument. But we look, you're almost like non-public forum. And I don't recall when we say that, oh, wait a minute, you lose because you could go someplace else. Again, I take it back to Lehman cases. You look at those ideas and you can post things on certain non-public places and they have restrictions. We don't, it's not resolved by saying, wait a minute, why don't you go down the street and post it someplace else? That's not the analysis. But it sounds to me that you're putting a whole lot of, you know, fruit in that basket on that saying, saying, well, you keep saying, oh, he could do someplace else. You lost on that. If we had said, you're right, this is like just documents. But we didn't say that. Instead, we say, no, go back and look at this on the speech principles of vagueness. And then also in terms of the burden shifting as to interest versus burden. That sounds like speech to me. It doesn't sound like something that can be easily jettisoned by saying, oh, let them eat cake, go someplace else. What's your response to that? Thank you, Judge Gregory. And I think it's an important distinction that you're raising. You're right. I lost before this very panel the last time we were here in trying to argue that this was just a record and he had other ways of doing it. But if you had agreed with me then, Your Honor, you're right, I would have won the case. But we are back. And what Your Honor and what this panel did when this case was here the last time is that it remanded the case for the district court to weigh the interests of the state against the burden imposed on Mr. Fusaro. And an assessment of the burden imposed on Mr. Fusaro necessarily entails looking at how his speech is harmed by not having access to this list. And what the record shows is the access to the list is not particularly important for what Mr. Fusaro is trying to accomplish here. In part because there are other resources for him to utilize, but also because his particular interest in this list is just not consonant with the purpose that he intends to use it for. He doesn't intend to utilize the list to try to reach very many voters at all. He doesn't know how he's going to select voters. He doesn't know, he wasn't able to articulate why the state prosecutor would be more responsive to letters and communications from voters who don't even identify themselves as such. It's just an explanation, Your Honor, that the particular burden on Mr. Fusaro in this case is not particularly weighty when confronted with in juxtaposition to the state interests involved. Now, if there was a specific need that he could have articulated that this list is critical for these particular reasons and none of these other resources that are available would allow me to engage in the speech that I want to engage in, we'd have a different case. But we don't have that case before this panel right now. And so I would submit that that aspect, the availability of other resources, is a component of the burden that this court remanded for the district court to consider. And so I see my time is up. And so unless there are other questions, I'll stop my presentation. All right. Thank you, Mr. Trenthope. Mr. Kline, you have some time reserved. Thank you. The point about donor lists that Maryland does put out a different, exclusive kind of list of donors, Marylanders, including their names and addresses, who give money to certain candidates or political committees undermines one of their own asserted interests in privacy. So we throw this kind of information out there publicly, go ahead and use it for issue advocacy. But we're going to protect voting history and otherwise names and addresses on this list. Moreover, as far as encouraging voters to vote, they continue citing, Mr. Trenthope just cited 15 to 30 complaints a year over its current uses. That's .000075% of the 4 million plus Maryland registered voters. If these are governmental interests that support censorship, I don't know what isn't. And that's a very chilling thing under Anderson Burdick. And that is why this should tip. Mr. Fusaro was deposed prior to the district court's ruling below, prior to its ruling in Judicial Watch. He was being deposed when he did not have access to the list at all. So the idea that he hadn't gotten that far as to how he could use it, I think is a little bit not used properly or not cited properly here. And moreover, he did mention in his deposition that he would endeavor to fundraise to spend more money. But he is on his own of limited means. So this burden, this idea, and we have the testimony of the 30 v. 6 witness noting that this is drawn from a central database, MD voters. It's updated every day. It is the way to get an assess on its face here, not that assessing the political engagement, at least by via voting history of Marylanders. Depriving Mr. Fusaro of this list is a burden, certainly a greater burden than the two interests asserted that still remain by the government. To your point, Judge Floyd, about subsidy, I just think under the NVRA, this again, this list is now required under federal law to be provided. So the subsidy is really a red herring at this point. To Mr. Trento's point, I respectfully but strongly disagree with his representation of IMS v. Sorrell. That was not a case, it was a case brought by pharmaceutical companies and data miners relating to access to information that was in the hands of pharmacies. So it was, in fact, this access case. It's not me and it's not Mr. Fusaro who have transformed this case. In fact, it's the ruling of the court below. That's again, what this is now is a state restriction, a content-based restriction. We can agree on that. Page 47, footnote 19, again, is one of the closer things. Is material discussing Black Lives Matter standing alone and without any reference to an election related to the electoral process? No. Is material discussing Black Lives Matter and its impact on an election, on one or more candidacies related to the electoral process? Yes. This is not complicated. Well, it is at the very least a content-based restriction on speech and it is now very much on the use. There's really no more access to this list problem here. This really is entirely about what this information that is, in fact, in private hands can be used for. Unless there are no further questions, again, I urge that the criminalization of speech is a serious problem here. There are numerous doctrines under the First Amendment that may be used to overturn the ruling of the court below. Let me ask a question. Since you have not sent in a letter, I think I'm correct about the record as it stands here. Aren't you really only left with the question of whether or not the chilling effect is so strong that it's a restriction? Because we don't know whether your letter would be passed muster or not, or whether it would be a violation. You have to convince us that it's an incredible chilling effect. Wouldn't you be left with that? As Judge Floyd asked about it, you're still insisting this is as applied. So we don't know what the application is yet because the instrumentality is not before us. So we're left with your chilling effect, aren't we? Your Honor, I think it does. I think it goes both both ways. I think the chilling effect, that's the very problem of censorship. The sort of bamacles, you know, is often brought up in these vagueness concerns. And moreover, I do want to reemphasize Mr. Fusaro's complaint. He has two letters, but he has also asserted, you know, that he would use this for various purposes. And that got a little bit chopped up, even in the court below, as to, you know, numerous letters that he wouldn't send. Because A, they're not related to the electoral process, or B, he doesn't really understand what this term means. So I do think both those issues are properly, you know, before this court. Albeit, I did just add A and B there to my paragraph. But, you know, again, I see my time has expired here. If there are no further questions, again, I urge reversal against the criminalization of speech. All right. Thank you very much. Mr. Klein, Mr. Trento, thank you so much for your argument. We wish we could come down and shake your hands in our normal Fourth Circuit testimony. We can't do that. But please know, nonetheless, that we very much appreciate it and your arguments. Thank you so much. Be safe and stay well. Thank you.
judges: Roger L. Gregory, Robert B. King, Henry F. Floyd